# Exhibit 1

Case Number: CACE-15-014390 Division: 21

Filing # 30772776 E-Filed 08/12/2015 12:10:00 PM

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT, IN AND
FOR BROWARD COUNTY FLORIDA

CASE NO.

MICHAEL KORETSKY, FRANK KORETSKY,
INTERNATIONAL VIDEO DISTRIBUTORS, LLC,
BEAUMONT FUND, LLC, and LONGMEADOW
TRADING, LLC,

       Plaintiffs,

v.

SEYFARTH SHAW, LLP, JOHN E. ROGERS,
individually and d/b/a as ROGERS & ASSOCIATES,
JETSTREAM BUSINESS LIMITED, WARWICK
TRADING, LLC, and SUGARLOAF FUND, LLC,

       Defendants.

_____/

## COMPLAINT

Plaintiffs, MICHAEL KORETSKY, FRANK KORETSKY, INTERNATIONAL VIDEO

DISTRIBUTORS, LLC, BEAUMONT FUND, LLC and LONGMEADOW TRADING, LLC,

through their undersigned attorneys sue Defendants, SEYFARTH SHAW LLP, JOHN E.

ROGERS, individually and d/b/a ROGERS & ASSOCIATES, JETSTREAM BUSINESS

LIMITED, WARWICK TRADING, LLC and SUGARLOAF FUND, LLC and state:

### THE PARTIES, JURISDICTION AND VENUE

1.    Plaintiff MICHAEL KORETSKY, is an individual and a resident and citizen of

Fort Lauderdale, Florida.

## ⌐ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
*t:* 954-525-9900  *f:* 954-523-2872

*** FILED: BROWARD COUNTY, FL HOWARD FORMAN, CLERK 8/12/2015 12:09:54 PM.****

2.      Plaintiff FRANK KORETSKY, is an individual and a resident and citizen of Sunny Isles Beach, Florida.  Michael Koretsky and Frank Koretsky are sometimes referred to below as the "Koretskys".

3.      Plaintiff INTERNATIONAL VIDEO DISTRIBUTORS, LLC ("International Video"), is a New Jersey limited liability company formed by the Koretskys in March 1996 and they are the sole members of International Video.

4.      Plaintiff BEAUMONT FUND, LLC ("Beaumont"), is an Illinois limited liability company organized by Defendant John E. Rogers on November 10, 2003.  Jetstream Business Limited was its Managing Member and Initial Member, until the Plaintiffs replaced Jetstream Business Limited in those positions on June 3, 2014.

5.      Plaintiff LONGMEADOW TRADING, LLC ("Longmeadow"), is an Illinois limited liability company organized by Defendant John E. Rogers on October 14, 2004.  Jetstream Business Limited was its Managing Member and Initial Member, until the Plaintiffs replaced Jetstream Business Limited in those positions on June 3, 2014.

6.      Defendant SEYFARTH SHAW LLP ("Seyfarth"), is a law firm organized as an Illinois limited liability partnership with offices at 131 South Dearborn Street, Chicago, Cook County, Illinois.  Seyfarth is subject to this Court's jurisdiction pursuant to Fla. Stat. §48.193 by reason of its (a) committing a tortious act within this state, (b) causing injury to the plaintiffs in this state by their acts and omissions related to their solicitation in Florida and (c) by providing services in this state.  The facts supporting this allegation are explicated at length below.

7.      Defendant JOHN E. ROGERS ("Rogers"), is a resident and citizen of Illinois and an attorney licensed to practice law in Illinois.  From about July 2003 until about May 2008, Rogers was employed as a partner by Seyfarth in its Chicago office, and as an agent of Seyfarth,

he acted within the scope of such employment and agency on behalf of Seyfarth. Beginning on or about June 2008 until the present, Rogers has been practicing law at Rogers & Associates, an unincorporated sole proprietorship in Chicago. From about May 2003 to 2011, Rogers promoted and sold securities in the form of equity interests in common law business trusts. Rogers is subject to this Court's jurisdiction pursuant to Fla. Stat. §48.193 by reason of his (a) committing a tortious act within this state, (b) causing injury to the plaintiffs in this state by his acts and omissions related to his solicitation in Florida and (c) by providing services in this state. The facts supporting this allegation are explicated at length below.

8.    THOMAS J. AGRESTI ("Agresti"), is an attorney licensed to practice law in Colorado.[1] He was a resident of Colorado and also conducted business across the country, where at all times relevant to the conduct complained of in this Complaint, he was acting as an agent of both Rogers and Seyfarth.

9.    Defendant JETSTREAM BUSINESS LIMITED ("Jetstream") was, on information and belief, formed by Rogers as a British Virgin Islands limited liability company in 2002. Further, on information and belief, Rogers reorganized Jetstream as a State of Delaware domestic corporation in 2008 due to concerns raised in certain United States Tax Court litigation involving Rogers' tax schemes. Rogers dominated the affairs of and exercised complete control over Jetstream as its sole director. Additionally, Jetstream was owned by Portfolio Properties, Inc., a subchapter S corporation, which was owned by Rogers. Thus, Rogers owned Jetstream and was its alter ego. Jetstream is subject to this Court's jurisdiction pursuant to Fla. Stat. §48.193 by reason of its (a) committing a tortious act within this state, (b) causing injury to the

---

[1]  According to the Colorado Bar website, Mr. Agresti was suspended from the practice of law for one year for "recklessly exercise[ing] unauthorized dominion and control over his client's funds . . ." *People v. Agresti*, No. 05PDJ054, 12/22/2005. http://www.cobar.org/tcl/tcl_articles.cfm?articleid=4520

⸗ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

plaintiffs in this state by its acts and omissions related to its solicitation in Florida and (c) by providing services in this state.   The facts supporting this allegation are explicated at length below.

10.    Defendant WARWICK TRADING, LLC ("Warwick") is an Illinois limited liability company, owned and controlled by Rogers. Warwick was created solely for the purpose of acquiring and contributing Brazilian consumer debt necessary for perpetuating one of the tax schemes described below.  Warwick's managing member was Jetstream, allowing Rogers as Jetstream's alter ego, to also control Warwick as its alter ego. Warwick is subject to this Court's jurisdiction pursuant to Fla. Stat. §48.193 by reason of its (a) committing a tortious act within this state, (b) causing injury to the plaintiffs in this state by their acts and omissions related to solicitation in Florida and also, (c) by providing services in this state. The facts supporting this allegation are explicated at length below.

11.    Defendant SUGARLOAF FUND, LLC ("Sugarloaf"), is an Illinois limited liability company, owned and controlled by Rogers and created solely for the purpose of acquiring and contributing Brazilian consumer debt necessary for perpetuating one of the tax schemes described below. Sugarloaf's managing member was Jetstream, allowing Rogers as Jetstream's alter ego, to also control Sugarloaf as its alter ego.  Sugarloaf is subject to this Court's jurisdiction pursuant to Fla. Stat. §48.193 by reason of its (a) committing a tortious act within this state, (b) causing injury to the plaintiffs in this state by their acts and omissions related to their solicitation in Florida and (c) by providing services in this state.  The facts supporting this allegation are explicated at length below.

12.    This court has jurisdiction pursuant to Fla. Stat. §26.012 and this is an action for damages in excess of $15,000, exclusive of interest and attorneys' fees.

-4-

13.     Venue is proper in Broward County as the Koretskys reside here and a substantial part of the acts complained of in this Complaint occurred in Broward County.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

### Overview of the Tax Shelters

14.     Rogers has a B.A. in mathematics and physics from the University of Notre Dame, a Juris Doctorate from Harvard Law School and an M.B.A. in international finance from the University of Chicago. Rogers spent 21 years as a senior partner with the accounting firm of Arthur Andersen before becoming Director of Tax and Assistant Treasurer of the $5 billion FMC Corporation from 1992 through 1997. Rogers joined Altheimer & Grey in 1998 as an equity partner where he devised and designed a tax shelter using distressed Brazilian consumer debt.

15.     In July 2003, Rogers joined Seyfarth as a partner, where he, along with Seyfarth, began to extensively promote, market, sell and implement two different types of tax shelters using distressed Brazilian consumer debt.  The campaign promoting the tax shelters was accomplished with Seyfarth's full knowledge, consent, cooperation, collaboration, participation and assistance.

16.     Two tax schemes were employed.  The first of which has been referred to as the *Distressed Asset Debt* tax shelter ("DAD Tax Shelter"), and the second was referred to as the *Distressed Asset Trust* tax shelter ("DAT Tax Shelter"), (the DAD Tax Shelter and the DAT Tax Shelter are sometimes collectively referred below to as the "DAD Tax Shelters").

17.     The DAD Tax Shelter transaction involved the client—a U.S. taxpayer— purchasing an interest in a limited liability company that was supposed to purchase and/or own a portion of a pool of distressed Brazilian consumer debt. Seyfarth and Rogers represented to

potential clients that they could use the purchased debt to claim an income tax deduction as part of a legitimate tax planning strategy.

18.     Similarly, the DAT Tax Shelter involved a transaction where the client-taxpayer would purchase an interest in a business trust or a sub-trust in which Rogers and others purported to own a portion of a pool of distressed Brazilian consumer debt. Again, Seyfarth and Rogers represented to potential clients that they could use the purchased debt to claim an income tax deduction as part of a legitimate tax planning strategy.

19.     In operation, Rogers' scheme involved the DAD Tax Shelter's sole *asset/debt*, a pool of distressed Brazilian consumer debt (the "Brazilian Debt Pool"), to be declared partially worthless shortly after its purchase. Thus, the U.S. Taxpayer had a bad debt loss that could, in theory, be used to offset and reduce taxable income under Section 166 of the Internal Revenue Code. Typically, a DAD Tax Shelter purchased a Brazilian Debt Pool portfolio at a price of approximately 5% of its face value, being the sum of each of the individual delinquent consumer accounts, while a DAT Tax Shelter paid about 10% of a Brazilian Debt Pool Portfolio's face value. The supposed tax loss was based on a subsequent write-off of the face value of the entire Brazilian Debt Pool, not the Brazilian Debt Pool's purchase price. For example, if a client-taxpayer purchased $1 million of debt for $50,000.00 from a Brazilian Debt Pool held as part of a DAD Tax Shelter, the write-off of the "partially worthless" debt generated a claimed tax loss of the entire $1,000,000.00 face value of the Brazilian Debt Pool purchased.

20.     Both the DAD and DAT Tax Shelters were annulled by the United States Congress through its passage of the American Jobs Creation Act (hereafter, the "AJCA") (*see* American Jobs Creation Act of 2004, P.L. 108-357). In a Coordinated Issue Paper dated April 18, 2007 ("DAD CIP"), following passage of the AJCA, the Internal Revenue Service ("IRS")

-6-

discussed the grounds for disallowing taxpayer deductions resulting from DAD Tax Shelter transactions. *See* copy of Coordinated Issue Paper attached as "**Exhibit A**."

21.    On February 27, 2008, following Congress' passage of the AJCA, the IRS released Notice 2008-34 that declared that as of October 22, 2004, the transaction referred to as a *distressed asset trust* a "tax avoidance transaction" and as a "listed transaction." *See* § 1.6011-4(b)(2) of the Income Tax Regulations and §§ 6111 and 6112 of the Internal Revenue Code.[2]

22.    In a Coordinated Issue Paper effective March 23, 2010 regarding Distressed Asset Trust (DAD) transactions, attached as "**Exhibit B**," the IRS set forth the reasons why all or some portion of claimed deductions arising from a DAT Tax Shelter should be disallowed.

23.    Based on passage of the AJCA and Rogers' and Agretti's education, professional experience and expertise and Seyfarth's institutional experience and expertise, they knew or should have known that the use of *distressed asset trusts* as a tax shelter would no longer deliver any of the tax benefits promised to Plaintiffs. On the contrary, Rogers, Agretti's and Seyfarth knew or should have known that the use of distressed asset trusts would subject the Plaintiffs to liability.

24.    With knowledge that Congress had passed the AJCA in the Fall of 2004, explicitly extinguishing the DAD Tax Shelters' ability to use partnerships (or limited liability companies claiming partnership status), Rogers, devised a new tax shelter making use of *trusts* instead of limited liability companies to implement the same transactions involving the purchase of foreign distressed debt employed in the DAD Tax Shelters to offset U.S. taxpayer tax liability, being a Distressed Asset Trust (DAT) tax shelter.

---

[2] "A listed transaction is a transaction that is the same as or substantially similar to one of the types of transactions that the Internal Revenue Service (IRS) has determined to be a tax avoidance transaction and identified by notice, regulation, or other form of published guidance as a listed transaction."

⸗ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

### The Rogers Entities

25.     Rogers wholly owned and/or controlled each of the international and domestic corporate, partnership and trust entities for which he engaged Seyfarth to provide professional legal services (collectively referred to as the "Rogers Entities"). The Rogers Entities were created and used by Rogers to acquire distressed Brazilian consumer debt that was contributed to domestic partnerships and limited liability companies, whose equity interests he sold to Plaintiffs as an investment that would also allow Plaintiffs to deduct 97% of the purported losses of the investment as described above.

26.     The Rogers Entities include:

a. **Jetstream Business Limited ("Jetstream")**; a British Virgin Islands limited liability company, originally formed by Rogers as a British Virgin Islands company in 2002. On information and belief, Rogers reorganized Jetstream as a State of Delaware corporation in 2008 due to concerns raised by the United States Tax Court in litigation involving Rogers' tax shelters. Jetstream was frequently used as the managing member of the various limited liability companies created for conducting the DAD Tax Shelter. Rogers had complete control of Jetstream as its sole director. Jetstream was owned by Portfolio Properties, Inc., which, in turn, was owned by Rogers. Thus, for all practical purposes, Rogers owned Jetstream and was its alter ego.

b. **Portfolio Properties, Inc. ("Portfolio"),** owner of Jetstream, is a U.S. Subchapter S corporation. Upon information and belief, as of 2010, Rogers was Portfolio's sole shareholder and had complete control of Portfolio. Thus, Portfolio owned Jetstream.

-8-

c. **Sugarloaf Fund, LLC ("Sugarloaf")** is a Delaware limited liability company used to acquire Brazilian consumer debt for purposes of carrying on the tax shelter scheme. Sugarloaf was used in both DAD and DAT distressed transactions. Jetstream was Sugarloaf's managing member, allowing Rogers, as Jetstream's alter ego, the corporate command and control he required. Rogers has expressly admitted that he was Sugarloaf's "chief and primary decision maker."

d. **Warwick Trading, LLC ("Warwick")** is an Illinois limited liability company. Warwick also acquired Brazilian consumer debt necessary for carrying on the tax scheme, but solely in transactions involving DAD. Jetstream was also Warwick's managing member, allowing Rogers, as Jetstream's alter ego, to maintain command and control over its activities. Rogers was Warwick's "chief and primary decision maker" as he was with Sugarloaf. Warwick is now a defunct entity having been involuntarily dissolved on June 10, 2011. Upon information and belief, Rogers used Warwick and Sugarloaf interchangeably for DAD Tax Shelter transactions in 2003 and 2004.

e. **Beaumont Fund, LLC, ("Beaumont"),** is an Illinois limited liability company organized by Rogers in 2003 to facilitate Plaintiffs' tax shelter investment. Jetstream was Beaumont's Managing Member and Initial Manager. On January 1, 2003, Plaintiffs replaced Jetstream Business Limited as Manager and Managing Member.

f. **Longmeadow Trading, LLC, ("Longmeadow"),** is an Illinois limited liability company organized by Rogers on in 2004 to facilitate Plaintiffs' tax shelter

⌐Ξ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900 f: 954-523-2872

investment. Jetstream was Beaumont's Managing Member and Initial Manager. On January 1, 2003, Plaintiffs replaced Jetstream Business Limited as Manager and Managing Member.

g. **Queen Trading, LLC ("Queen")** was formed by Rogers long before he formed Beaumont and Queen was used by Rogers in conjunction with Beaumont and Warwick to facilitate Plaintiffs' 2003 tax shelter investment.

h. **Bodensee Fund, LLC ("Bodensee")** was formed by Rogers long before he formed Longmeadow and was used by Rogers in conjunction with Longmeadow and Sugarloaf to facilitate Plaintiffs' 2004 tax shelter investment.

<u>**Rogers' Sale of Investment Contract Securities**</u>

27. Rogers implemented the DAD, and after 2004, the DAT Tax Shelters, by finding law firm clients, who were U.S. citizens seeking tax planning advice, and placing them into these tax shelters.

28. Actual implementation of the DAD Tax Shelter was effected by Rogers urging his clients, including Plaintiffs in 2003 and 2004, to purchase membership interests in various limited liability companies ("LLC Securities").

29. Rogers' implementation and operation of his Brazilian debt collection business, was a venture separate and distinct from his role as a partner at Seyfarth. The sale of the LLC Securities was a key component necessary for Rogers to maintain his Brazilian debt collection business—from which he personally profited.

<u>**Agresti Acted as Rogers' Agent**</u>

30. Rogers utilized agents across the country to promote the sale of LLC Securities to targeted investors. Beginning around July 2003, Agresti became a key agent for Rogers,

≣ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

including selling LLC Securities to Plaintiffs. At all times pertinent hereto, Agresti was Rogers' agent and Rogers directed Agresti's performance of these duties.

31.     Rogers directed and authorized his agents, including Agresti, to initiate contact with, recruit, provide information about the Brazilian debt collection business/tax shelter to, and facilitate client-taxpayers in the purchase of LLC Securities.

32.     Rogers further directed Agresti to aggressively market the sale of LLC Securities by placing advertisements in magazines advertisements, and to advise potential investors of both an inflated profit potential arising out of the Brazilian debt collection business and the promise of an eventual IPO for the business.

33.     At the same time, Rogers also directed his agents, including Agresti, to knowingly make misrepresentations of material fact, and advise potential clients, including Plaintiffs that the DAD/DAT Tax Shelters were legitimate and legal tax planning vehicles, in order to convince those clients to invest.

### Rogers Sold LLC Securities to Plaintiffs through Agresti

#### *2003 and 2004 Investment*

34.     On or about October 2003, Plaintiffs contacted Agresti by telephone in response to advertisements that had been placed by Agresti to promote the investment opportunity in Rogers' distressed Brazilian consumer debt business. At that time, Agresti promoted the DAD Tax Shelter and investment in LLC Securities to Plaintiffs as a strategy that was positioned to attain enormous growth and future profits.

35.     From October 2003 through approximately December 31, 2004, Agresti and Plaintiffs engaged in several telephone calls and exchanged e-mails in which Agresti, as an agent of Rogers, represented to Plaintiffs that (i) the DAD Tax Shelter was, first and foremost, an

-11-

investment opportunity with the potential for beneficial tax treatment; (ii) the DAD Tax Shelter had been thoroughly reviewed by Seyfarth, a multinational law firm; (iii) Seyfarth approved the legal bona fides of the DAD Tax Shelters; and (iv) Seyfarth would draft and execute the necessary documents, and would defend any investor in litigation should the need arise.

### Seyfarth's Malpractice

36.     Rogers was a partner at and employed by Seyfarth as an attorney from July 2003 to May 2008, during which time, he was an agent of Seyfarth.  Accordingly, at all times pertinent hereto, Rogers' knowledge and conduct related to the DAD Tax Shelters is imputed to Seyfarth.

37.     Immediately after starting as a partner with Seyfarth in its tax department in July 2003, Rogers began to market, promote and sell DAD/DAT Tax Shelters to potential taxpayer-clients, including Plaintiffs. Rogers promoted the DAD/DAT Tax Shelters primarily out of Seyfarth's law offices in Chicago utilizing Seyfarth personnel, infrastructure and equipment.

38.     At all times pertinent hereto, Seyfarth management, partners and senior attorneys, including, but not limited to Peter Woodford, Edward Karlin and John Napoli, knew about and approved Rogers' use of Seyfarth personnel, infrastructure and equipment to market, promote and sell the DAD/DAT Tax Shelters to U.S. taxpayers, including Plaintiffs.

39.     At all times pertinent hereto, Rogers utilized his law firm, Seyfarth, to provide professional legal and tax services to the various international and domestic corporate, partnership and trust entities Rogers caused to be created, and to effect the sale and implementation of the alleged tax benefits of the DAD/DAT Tax Shelters.

### Seyfarth Produced Legal Work Primarily for Plaintiffs' Benefit And Owed Them A Duty Of Care

#### *2003 DAD Deal Documents*

≡ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

40.     In or about October 2003, Rogers, on behalf of the Rogers Entities, engaged Seyfarth to provide professional legal services to Rogers Entities specifically for purposes of benefiting Plaintiffs.

41.     In or about November 2003, Seyfarth's partners and employees, including, but not limited to, Rogers, Paul Chadha, Sweta Shah, Maria Koenigsberg, Diane Campaneel, Diane Griffin, Robert Paley, Robert Weber and Richard Cutshaw, drafted and prepared and/or caused to be drafted and prepared for Plaintiffs, the following documents to facilitate and memorialize Plaintiffs' purchase and/or investment in the DAD Tax Shelter ("2003 DAD Deal Documents"): Contribution Agreement; Membership Interest Contribution Agreement; Membership Interest Purchase Agreement; and Subscription Agreement for Additional Membership Interest are attached as **Composite Exhibit C.**

42.     In about November 2003, after Seyfarth prepared the 2003 DAD Deal Documents for Plaintiffs, they were provided to Agresti who then presented them to Plaintiffs for execution.

43.     Seyfarth was aware that the primary intent of the Rogers Entities was that the 2003 DAD Deal Documents would be for the benefit of Plaintiffs, which created a duty of care on the part of Seyfarth to Plaintiffs.

*2004 DAD Deal Documents*

44.     On or about December 2004, Rogers engaged Seyfarth to provide professional legal services to the Rogers Entities solely for the purpose of benefiting Plaintiffs.

45.     In or about December 2004, Seyfarth's partners and employees, including, but not limited to, Rogers, Paul Chadha, Sweta Shah, Maria Koenigsberg, Diane Campaneel, Diane Griffin, Robert Paley, Robert Weber and Richard Cutshaw, drafted and prepared and/or caused to be drafted and prepared, for Plaintiffs, the following documents to facilitate and memorialize

≡ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

Plaintiffs' purchase and/or investment in the DAD Tax Shelter ("2004 DAD Deal Documents"): Contribution Agreement, Membership Interest Contribution Agreement, Membership Interest Purchase Agreement, Subscription Agreement for Additional Membership Interest, and Promissory Note, all of which are attached as **Composite Exhibit D**.

46.    In or about December 2004, after Seyfarth prepared the 2004 DAD Deal Documents for Plaintiffs' benefit, they were provided to Agresti who then presented to Plaintiffs for execution.

47.    Seyfarth was aware that the legal work performed, including Seyfarth's preparation of the 2004 DAD Deal Documents, was for the benefit Plaintiff, which created a duty of care on the part of Seyfarth to Plaintiffs.

*Seyfarth and Rogers Continue to Prepare Plaintiffs' Tax Returns through 2010*

48.    Between 2004 and 2008, Rogers, in his capacity as a Seyfarth attorney, continued to prepare and provide Plaintiffs with Form 1065 U.S. Income Tax Return of Partnership Income and Schedule K-1s for Plaintiffs' interests in Beaumont and Longmeadow.

49.    At all times material hereto, Seyfarth, through its partner Rogers, participated in discussions and meetings with the Koretskys regarding the purchase of DAD and DAT Tax Shelters.

50.    Rogers and Seyfarth knew that the primary purpose of Rogers' representation of Sugarloaf and the Plaintiffs Trust was principally for the benefit of Plaintiffs, and as a result, he and Seyfarth owed Plaintiffs a duty of care as an attorney.

51.    As a result, Seyfarth had a duty to use its skill, prudence and diligence as a member of the legal profession commonly possesses and exercises, in providing legal services to Plaintiffs.

⌐Ξ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

## SEYFARTH BREACHED ITS DUTY OF CARE

### Conflict of Interest

*The Rogers Entities Are Used to Implement Plaintiffs' 2003 Investment*

52.     In early 2003, Rogers simultaneously provided personal business advice and legal services to Warwick (a Rogers Entity) in Warwick's acquisition of a portfolio of Brazilian consumer receivables (a form of DAD) from Lojas Arapua, S.A. ("Arapua"), a large consumer retailer located in Brazil.

53.     To effect the DAD Tax Shelter transaction, Rogers, as businessman and lawyer, (i) caused Warwick to acquire a Brazilian Debt Pool; (ii) caused the formation of Queen to acquire the Brazilian Debt Pool from Warwick in exchange for Warwick acquiring a 99% interest in Queen; (iii) caused the formation of Beaumont to acquire 98% of Warwick's interest in Queen in exchange for Warwick acquiring a 99% interest in Beaumont; and (iv) caused Warwick to sell its interest in Beaumont to Plaintiff, International Video.

54.     On November 10, 2003, Rogers, simultaneously as businessman and lawyer, caused Warwick to contribute a portion of its Brazilian Debt Pool to Queen in exchange for 99% of the membership interest in Queen. Jetstream owned the remaining 1%. *See* Membership Interest Contribution Agreement, Composite Exhibit C.

55.     On November 11, 2003, Rogers, simultaneously as businessman and lawyer, caused Warwick to contribute 98% of its 99% membership interest in Queen to Beaumont. In this exchange, Warwick acquired a 99% membership interest in Plaintiff Beaumont. *See* Composite Exhibit C.

⊒ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

56. Further, on November 11, 2003, Rogers, acting as both businessman and lawyer, caused Warwick to sell a 99% interest in Beaumont to International Video for US $150,000 under a Membership Interest Purchase Agreement. *See* Exhibit C.

57. In about November 2003, Rogers, acting as both businessman and lawyer, and, through Agresti, represented to Plaintiffs that in order to take the full amount of the DAD's face amount as a deduction, they needed only to subscribe to additional membership interests in Beaumont and fund his subscription with a non-recourse promissory note.

58. On November 13, 2003, Rogers, acting as both businessman and lawyer, with Agresti acting as his agent, advised and directed Plaintiffs, through International Video, to sign a Subscription Agreement for Additional Membership Interest in Beaumont (the "Beaumont Subscription Agreement") in which Plaintiffs agreed to pay Beaumont an additional US $4,850,000 on or before December 31, 2003. *See* Subscription Agreement for Additional Membership Interest, Composite Exhibit C.

59. In November 2003, Rogers, acting as both businessman and lawyer, caused a document entitled "Promissory Note" to be prepared by Seyfarth for Plaintiffs to sign to satisfy his $4,850,000 obligation under the Subscription Agreement.

60. Prior to the end of 2003, Rogers, acting as both businessman and lawyer, made a declaration of partial worthlessness with respect to the *foreign debt* contributed to Beaumont, thus falsely advising Plaintiffs of his right, as owner of 99% of the membership interests, through International Video, of Beaumont, to claim a bad debt deduction on his 2003 income tax return.

61. For the year 2003, Rogers, in his capacity as a tax attorney, provided Plaintiffs a Form 1065 U.S. Income Tax Return of Partnership Income and a Schedule K-1 for Plaintiffs'

᷄ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900 f: 954-523-2872

interest in Beaumont that reported Plaintiffs' losses from the "foreign distressed debt." As a result, Plaintiffs prepared and filed their tax return reporting the losses provided by Rogers.

*The Rogers Entities Are Used to Implement Plaintiffs' 2004 Investment*

62.     To effect the 2004 DAD Tax Shelter transaction, Rogers, acting as both businessman and lawyer, (i) caused Sugarloaf to acquire a portfolio of distressed Brazilian debt ("Debt"); (ii) caused the formation of Bodensee Fund, LLC and for that entity to acquire the Debt from Sugarloaf in exchange for Sugarloaf acquiring a 99% interest in Lonsway; (iii) caused the formation of a second entity (Longmeadow Trading, LLC) to acquire 98% of Sugarloaf's interest in Bodensee in exchange for Sugarloaf acquiring a 99% interest in Longmeadow; and (iv) caused Sugarloaf to sell its interest in Longmeadow to Investment Video.

63.     In order to effectuate the 2004 DAD Tax Shelter, Rogers, simultaneously as businessman and lawyer, caused the documents identified in ¶ 45 above to be drafted, executed, and delivered to Plaintiffs. The result of this structuring and paperwork was that by December 31, 2004, Plaintiffs, through International Video, owned a 99% interest in Longmeadow, backed by additional Brazilian Debt Pools.

64.     Following Plaintiffs' investment in the 2004 DAD Tax Shelter, Rogers provided Plaintiffs a Form 1065 U.S. Income Tax Return of Partnership Income and a Schedule K-1 for Longmeadow that reported Plaintiffs' losses and prepared and filed his tax return reporting the losses provided by Rogers.

**The Conflict of Interest**

65.     Seyfarth and Rogers knowingly and willfully provided legal and tax advice to both Plaintiffs and Rogers and his entities in DAD Tax Shelter transactions without advising Plaintiffs of the conflict of interest or acquiring a waiver of the conflict.

BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

66.    As pled above, Seyfarth drafted and prepared and/or caused to be drafted the 2003 and 2004 DAD Deal Documents to implement DAD Tax Shelters for and on behalf of Plaintiffs. As a result Plaintiffs invested in the 2003 and 2004 DAD Tax Shelters by contracting with Sugarloaf, a Seyfarth client, to purchase an interest in Beaumont and Longmeadow.

67.    Seyfarth's partner, Rogers, created Beaumont and Longmeadow long before he even knew Plaintiffs.    However, Beaumont, Longmeadow, Warwick, Sugarloaf, Rogers, Letstream, Queen Trading and Bodensee were all clients of Seyfarth.    Further, Warwick Portfolio Properties and Sugarloaf were solely owned by Seyfarth's partner, Rogers.

68.    Seyfarth represented Rogers and the foregoing companies while at the same time owing a duty of care as attorneys to Plaintiffs, both of whose interests were in conflict to that of Seyfarth's clients, Rogers and his companies.  In other words Seyfarth represented both sides of the DAD Tax Shelters.  Prior to assuming the representation of Plaintiffs, neither Seyfarth nor Rogers disclosed the existence of the inherent and obvious conflict of interest.  Nor did Seyfarth and Rogers ever obtain a waiver of the conflict of interest by Plaintiffs.

69.    Further, between about October 2003 to about September 2013, Seyfarth, Rogers and willfully concealed the full relationship between Seyfarth and Rogers by concealing from Plaintiffs that Rogers was simultaneously: (a) creator of the DAD Tax Shelters; (b) equity owner of the corporate entities used to implement the DAD Tax Shelters; and (c) a Seyfarth law partner.

### Seyfarth and Rogers Negligently, Carelessly and Erroneously
### Represented a Document As a "Promissory Note" to Plaintiffs' Detriment

70.    In 2003 and 2004, Seyfarth's partner, Rogers used and directed Seyfarth attorneys to prepare the Promissory Notes identified above for its clients Warwick and Sugarloaf, fully aware that their primary intent was for the Promissory Notes to relate to Plaintiffs' investment in

≡ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

the 2003 and 2004 Tax Shelters.  Seyfarth and Rogers, further advised Plaintiffs that the Promissory Notes would validate their investment in the respective 2003 and 2004 DAD Tax Shelters by satisfying Internal Revenue Code § 465 "at risk" rule.  Plaintiffs signed the Promissory Notes for the 2003 and 2004 DAD Tax Shelters on the advice of Seyfarth and Rogers.

71.     Seyfarth and Rogers intended the documents to be promissory notes in accordance with the negotiable instrument requirements for promissory notes under Article 3 of the Uniform Commercial Code.  However, the Promissory Notes do not satisfy the requirements of Article 3 §3-104(a) Uniform Commercial Code.

72.     The failure of the documents Seyfarth and Rogers prepared to qualify as negotiable instruments and promissory notes made it impossible for Plaintiffs to have satisfied the Internal Revenue Code at risk rule.  Accordingly, Seyfarth and Rogers' legal advice as to the validity and effectiveness of the Promissory Notes was materially false and misleading.

73.     Seyfarth and Rogers knew or should have known that the Promissory Notes it prepared would not qualify under the Illinois Uniform Commercial Code as promissory notes.

74.     Seyfarth's and Rogers' knowledge that the primary intent of Warwick, Sugarloaf, Jetstream, and Rogers was that the Promissory Notes would benefit Plaintiffs, created a duty of care that Rogers and Seyfarth owed to Plaintiffs.

75.     Rogers and Seyfarth breached their duty of care to Plaintiffs by preparing instruments that did not qualify as promissory notes.

76.     Plaintiffs relied to their detriment on Seyfarth and Rogers' materially false, misleading representations, related to the Promissory Notes.

### Misleading and Erroneous Legal and Tax Advice

≡ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

77.     The legal and tax advice rendered by Seyfarth and Rogers to Plaintiffs that induced for Plaintiffs to invest in Beaumont and Longmeadow in November 2003, and October 2004, was materially false, misleading, and erroneous because Congress and the Internal Revenue Service had already determined that the DAD transactions Seyfarth and Rogers, in their capacity as law partners, documented for Plaintiffs were abusive tax avoidance schemes, and lacked viable economic substance and business purpose.

78.     On July 17, 2007, Seyfarth's counsel, Jean A. Pawlow, of McDermott Will & Emery, affirmed in a letter to the Internal Revenue Service, that Seyfarth's preparation of DAD transactional purchase documents and tax returns for investor-clients.

79.     Seyfarth and Rogers prepared the 2003 and 2004 DAD Deal Documents for the Plaintiffs so that they could purchase their interests in the 2003 and 2004 DAD Tax Shelters through International Video.

80.     Seyfarth and Rogers prepared Plaintiffs' 2003, 2004, 2005, 2006, 2007, and 2008 Form 1065 U.S. Income Tax Return of Partnership Income and Schedule K-1s.

81.     Seyfarth and Rogers' knowledge that the primary intent of Warwick, Sugarloaf, Jetstream, and Rogers was for the 2003 and 2004 DAD Deal Documents to benefit Plaintiffs created a duty of care that Seyfarth owed to Plaintiffs.

82.     Seyfarth and Rogers breached their duty of care to Plaintiffs by preparing documents that were legally ineffective and encouraged Plaintiffs to take illegal deductions on their tax returns on the basis of the illegitimate losses as reported to Plaintiffs by Seyfarth and Rogers.

83.     Plaintiffs relied to their detriment on Seyfarth and Rogers' materially false, misleading representations made to him.

≡ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

## Seyfarth Knew the DAD Tax Shelters Were Illegal and Illegitimate
## Thereby Breaching Their Duty of Care to Plaintiffs as His Attorney

84.     Given its status as a first rate multi-national law firm, containing specialized tax and corporate law division, Seyfarth knew or should have known that the basis in the debt acquired from Sugarloaf by the client-specific trusts created by Rogers, was insufficient to justify the amount of the carryover/transferred basis that provided for the amount of the tax deduction taken by Plaintiff. 26 C.F.R. 1.723-1; *see also* 26 U.S.C. § 1012

85.     Seyfarth knew or should have known that the debt did not, and could not become partially worthless within the taxable year the loss was claimed. 26 U.S.C. § 166(a)(1)-(2).

86.     Seyfarth further knew or should have known that the illicit tax schemes would violate the "sham partnership doctrine" which disregards purported "partnerships" where the partners do not have a common intention to pursue collectively a joint economic enterprise having economic substance and a legitimate business purpose when the "partnership's" purposes in this instance were to generate tax losses. Here, the Brazilian retailers that transferred their accounts receivable to Sugarloaf were motivated by a desire to convert those accounts into ready cash. On the contrary, Sugarloaf was acquiring the accounts solely for their built-in losses that would be used to generate substantial tax deductions.

87.     Seyfarth knew or should have known that the DAT Tax Shelter transactions were "listed transactions" and "tax avoidance" devices that were not legal in accordance with provisions of the Internal Revenue Code.

88.     Seyfarth knew or should have known that the DAT Tax Shelter would be considered an "abusive tax avoidance" device, since it was substantially similar to the DAD Tax Shelter that Congress had annulled in October 2004.

-21-

## ⨳ BERGER SINGERMAN

89.     Consequently, Seyfarth knew or should have known that: (a) under I.R.C. 212(2), their U.S. taxpayer clients, including Plaintiffs and the other Plaintiffs, would not be able to deduct  legal and promoter fees; (b) the DAT Tax Shelters would violate I.R.C. Section 6662(b)(1) that imposes a penalty on taxpayers who are negligent in complying with the provisions of the Internal Revenue Code; (c) the DAT Tax Shelters would violate I.R.C. Section 6662(a) and (b)(2) that imposes a penalty for an underpayment based on a understatement of income tax; and (d) the DAT Tax Shelters would violate I.R.C. Section 6662(e)(2) that imposes a penalty on a taxpayer who substantially misstates its tax liability.

90.     Even though Seyfarth knew or should have known the material facts stated above, Seyfarth promoted the DAD Tax Shelters to Plaintiffs as a legitimate and legal investment.

91.     In fact, the DAD Tax Shelters devised, designed, promoted and sold by Seyfarth to Plaintiffs, failed to satisfy any of the conditions necessary for Plaintiffs to receive the promised tax benefits.

92.     In addition to the foregoing, in order for Plaintiffs' DAD Tax Shelters investments to be effective and legal, Plaintiffs also needed to invest a sufficient amount of capital into DAD entities they acquired so they would be "at risk" for an amount at least equal to the bad debt losses generated and reported by Warwick and Sugarloaf.

93.     Internal Revenue Code Section 465 "limits the deductibility of losses to a taxpayer's economic investment (the amount at risk) in the activity at the close of a taxable year. A taxpayer is generally considered at risk in an activity to the extent of cash and the adjusted basis of property contributed by the taxpayer to the activity. In general, a taxpayer's amount at risk also includes any amounts borrowed for use in the activity if the taxpayer is personally liable

≛ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

for repayment or if property other than property used in the activity is pledged as security." *See* Internal Revenue Bulletin 2004-20 TD 9124 summarizing IRC § 465.

94.     The method that Seyfarth and Rogers designed to provide the Plaintiffs with the tax deduction benefit from their investment in the DAD Tax Shelters was inherently flawed due to the failure of the Promissory Notes to qualify as a Uniform Commercial Code negotiable instrument and thus, failed to comply with Section 166 of the Internal Revenue Code.

95.     Thus, Seyfarth and Rogers knew, or should have known, that the deductions taken by Plaintiffs would be limited by the "at risk" rule of the Internal Revenue Code.

96.     Seyfarth and Rogers continued promotion and sale of the DAD Tax Shelters to Plaintiffs even though they knew, or should have known as tax law experts, that the DAD Tax Shelters were illegitimate and illegal constituted a failure to meet the standard of care members of the legal profession commonly possess and exercise in providing legal services.

97.     Seyfarth knew Rogers' role as designer and creator of the DAD Tax Shelter and role in the Rogers Entities used to implement the tax shelters, was a material fact that was intentionally not disclosed to Plaintiffs.

### Seyfarth's Breach of Its Duty of Care to Plaintiffs Caused Plaintiffs' Injuries

98.     In deciding to invest in the DAD Tax Shelters, Plaintiffs relied on Seyfarth' continued assurances that the DAD Tax Shelters were legitimate and likely to be upheld, even though Seyfarth knew that the DAD Tax Shelters were, in fact, illegal.

99.     Plaintiffs relied on Seyfarth' continued and constant assurances that the DAD Tax Shelters were legitimate and likely to be upheld in deciding to report the losses on his tax returns as provided to him by Seyfarth on Form 1041s for the tax years 2003 – 2010.

≝ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
*t:* 954-525-9900  *f:* 954-523-2872

100.    But for Seyfarth' constant assurances in preparing the implementation documents and issuing Form 1041s for the tax years 2003-2010, Plaintiffs would not have invested in the DAD Tax Shelters.

101.    Plaintiffs' reliance on Seyfarth' misrepresentations was foreseeable because Seyfarth was an expert in tax law, who specifically promoted his decades' long experience practicing tax law to encourage Plaintiffs to invest in the DAD Tax Shelters.

102.    As a result, the IRS has denied or shall deny all income tax deductions to Plaintiffs from his investments in Seyfarth' DAD Tax Shelters for all years.

103.    Furthermore, as a result of Plaintiffs' reliance on Seyfarth' fraudulent misrepresentations in reporting his losses, the IRS has assessed Plaintiffs with thousands of dollars worth of penalties and fines.

## ROGERS' and ROGERS & ASSOCIATES' MALPRACTICE

### Rogers and Rogers & Associates Owed Plaintiffs a Duty of Care as an Attorney

104.    After Rogers resigned from Seyfarth in or around May, 2008, on information and belief, Rogers became the sole proprietor of Rogers & Associates, an unincorporated sole proprietorship.[3]

105.    From May, 2008 until on or about 2010, Rogers provided professional legal and tax services to Beaumont and Longmeadow.  Plaintiffs held an equity interest in both Beaumont and Longmeadow.

106.    Between 2008 and 2010, Rogers continued to prepare and provide Plaintiffs with Form 1065 U.S. Income Tax Return of Partnership Income and Schedule K-1s for Plaintiffs' interests in Beaumont and Longmeadow.

---

[3] Unless indicated otherwise, any alleged act of Rogers from 2008 to 2010 is also alleged to have been performed by Rogers & Associates.

## ⋽ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

107.    Sugarloaf, a Rogers Owed and Controlled Entity, provided the Schedule K-1 to Beaumont and Longmeadow for the tax year 2010.

**Rogers and Rogers & Associates Breached its Duty of Care to Plaintiffs as an Attorney**

**Rogers' and Rogers & Associates' Conflict of Interest**

108.    Between on or about July, 2008 to on or about 2010, Rogers knowingly and willfully provided legal and tax advice to Sugarloaf, a Rogers Owned and Controlled Entity, and Beaumont and Longmeadow, entities in which Plaintiffs held a substantial equity interest.

109.    Rogers sold Plaintiffs their interests in Beaumont and Longmeadow in 2003 and 2004 to implement the 2003 and 2004 DAD Tax Shelters.

110.    Rogers represented Sugarloaf, Jetstream, Portfolio Properties, Queen Trading, and Bodensee Fund while at the same time owing a duty of care as attorneys to Plaintiffs, both of whose interest was in conflict to that of Rogers' clients (i.e., Sugarloaf, Jetstream, Portfolio Properties, Queen Trading and Bodensee Fund).

111.    Rogers never disclosed the inherent conflict of interest caused by representing Plaintiffs, International Video, Beaumont, and Longmeadow on one side and Sugarloaf, Jetstream, Portfolio Properties, Queen, and Bodensee on the other.

112.    From about July, 2008 to about September, 2013, Rogers willfully concealed the true relationship between Rogers and Sugarloaf, Jetstream, Portfolio Properties, Queen Trading and Bodensee Fund by concealing from Plaintiffs that these entities were Rogers Entities.

113.    Rogers never requested nor received a waiver from Plaintiffs for the conflict of interest by, between and among Rogers, the Rogers Entities on one side and Plaintiffs, Beaumont and Longmeadow on the other.

**≡ BERGER SINGERMAN**

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

**Rogers and Rogers & Associates Knew that the DAD Tax Shelter was Illegal and Illegitimate**

114. Rogers knew or should have known that the basis in the debt acquired from Sugarloaf by the client-specific trusts created by Rogers was insufficient to justify the amount of the carryover/transferred basis (per Treasury Regulation 723) that allowed the amount of deduction taken.

115. Rogers knew or should have known that the debt did not (per I.R.C. 166(a)(1)), and could not, become partially worthless within the taxable year the loss was claimed.

116. Rogers knew or should have known that the illicit DAD tax scheme would violate the "sham partnership doctrine" which disregards purported "partnerships" where the partners do not have a common intention to pursue collectively a joint economic enterprise having economic substance and legitimate business purpose and the "partnership's" purposes are to generate tax losses.

117. Rogers knew or should have known that the DAD Tax Shelter transactions are "listed transactions" and "tax avoidance" devices that are not in accordance with provisions of the Internal Revenue Code and Congressional purpose.

118. Rogers knew, or should have known, the DAD Tax Shelter would be considered an "abusive tax avoidance" device, especially since it was substantially similar (differing only structurally) to the DAD Tax Shelter that Congress had annulled in October, 2004.

119. Consequently, Rogers knew or should have known that:

a.       under I.R.C. 212(2), their U.S. taxpayer clients, including Plaintiffs and the other Plaintiffs, would not be able to deduct legal and promoter fees;

≡ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900 f: 954-523-2872

b.     the DAD Tax Shelters would violate I.R.C. Section 6662(b)(1) that imposes a penalty on taxpayers who are negligent in complying with the provisions of the Internal Revenue Code;

c.     the DAD Tax Shelters would violate I.R.C. Section 6662(a) and (b)(2) that imposes a penalty for an underpayment based on a understatement of income tax; and

d.     the DAD Tax Shelters would violate I.R.C. Section 6662(e)(2) that imposes a penalty on a taxpayer who substantially misstates its tax liability.

120.    Even though Rogers and Rogers & Associates knew or should have known the material facts stated herein Rogers and Rogers & Associates continued to assert to Plaintiffs that the DAD Tax Shelter was a viable and legitimate investment vehicle, destined to be upheld by the IRS.

121.    Internal Revenue Code Section 465 "limits the deductibility of losses to a taxpayer's economic investment (the amount at risk) in the activity at the close of a taxable year. A taxpayer is generally considered at risk in an activity to the extent of cash and the adjusted basis of property contributed by the taxpayer to the activity. In general, a taxpayer's amount at risk also includes any amounts borrowed for use in the activity if the taxpayer is personally liable for repayment or if property other than property used in the activity is pledged as security." *See* Internal Revenue Bulletin 2004-20 TD 9124 summarizing IRC § 465.

122.    Rogers knew, or should have known, the deductions taken by Plaintiffs would be limited by the "at risk" rule of the Code.

123.    Rogers continued promotion of the DAD Tax Shelter as sound, as well as its concealment from Plaintiffs of the material fact that the DAD Tax Shelter was fundamentally

## BERGER SINGERMAN

flawed, and had been expressly invalidated by Congress, constituted a failure to meet the standard of care members of the legal profession commonly possess and exercise in providing legal services.

### Rogers and Rogers & Associates' Breach of Its Duty of Care to Plaintiffs Caused Plaintiffs' Injuries

124.    Plaintiffs relied on Rogers' continued and constant assurances that the DAD Tax Shelter was legitimate and likely to be upheld in deciding to report the losses on his tax returns as provided to him by Rogers on Form 1065s and K-1s for the 2009 and 2010 tax years.

125.    But for the continued and constant assurances of Rogers, Plaintiffs would not have continued to report the losses on their tax returns for the 2009 and 2010 tax years.

126.    Plaintiffs' reliance on Rogers' misrepresentation was foreseeable because Rogers specialized in tax law, and Plaintiffs had relied on Rogers since 2003.

127.    As a result, the IRS has denied or shall deny all income tax deductions to Plaintiffs from investments in the DAD Tax Shelter for all years.

128.    Furthermore, as a result of Plaintiffs' reliance on Rogers' fraudulent misrepresentations in reporting his losses, the IRS has assessed Plaintiffs with thousands of dollars worth of penalties and fines.

⋚ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

## FRAUDULENT CONCEALMENT/EQUITABLE ESTOPPEL

### Tolling of Statutes of Limitations

129.    The causes of action asserted herein below are timely filed as Seyfarth, Rogers, and Rogers & Associates, fraudulently concealed their wrongful conduct from Plaintiffs by continued reassurances to Plaintiffs that the DAD Tax Shelters and LLC Securities were legitimate and legal.

130.    From 2007 through at least 2010, Rogers, as an attorney working for Sefarth and as the sole proprietor of Rogers & Associates, spoke with Plaintiffs via telephone and email, and reassured Plaintiffs that the 2003 and 2004 DAD Tax Shelters were either profitable, or would turn a profit in the near future, and that Plaintiffs would face no liability as a result of his involvement in the DAD Tax Shelters.

131.    Around December 2007, Rogers, as an attorney working for Seyfarth, sent Plaintiffs a newsletter stating that, although the IRS was investigating the DAD Tax Shelters, Plaintiffs did not need to worry, as the law, embodied by recent court decisions, supported the Tax Shelters as legal.

132.    Rogers knew that this statement was false and materially misleading when he made it because Rogers, as a tax attorney and tax and securities law expert, knew that the AJCA, passed in 2004, had nullified the DAD Tax Shelters, and that Plaintiffs' investments would be voided, subjecting Plaintiffs to massive penalties and fees.

133.    Additionally, the 2007 Newsletter assured Plaintiffs that his investment did not violate section 469 of the IRC because Rogers was involved in the day-to-day operation and management of the collection activities, thus creating non-passive, active business activity and losses.

-29-

134.    Rogers knew that Plaintiffs' investment was an illegal tax shelter because he knew that the DAD Tax Shelter violated the IRC, including section 469's prohibition against passive losses because Rogers was not involved in the day-to-day management of the collection activities, since such collection activities never occurred.  This lack of collection activity resulted in passive losses, violating section 469, and creating an illegal and illicit tax shelter, rather than a bona fide business with corresponding losses.

135.    In or around June 2008, Rogers, as a Seyfarth attorney, sent Plaintiffs a Newsletter stating that, although the IRS had expanded the scope of its investigation to include the 2005 and 2003 tax years, Plaintiffs did not need to worry, as the case in federal tax court against the IRS was going well.

136.    Rogers knew that this statement was false and materially misleading when he made it because Rogers, as a tax attorney and tax and securities law expert, knew that the AJCA, passed in 2004, had nullified the DAD Tax Shelters, and that Plaintiffs' investments would be voided, subjecting Plaintiffs to massive penalties.

137.    Further, the 2008 Newsletter stated that the investments were profitable, and that, although profits had decreased, Plaintiffs did not need to worry, as Plaintiffs could expect greater returns on their investment in the near future as a result of renewed efforts to collect on the underlying distressed debt.

138.    Rogers knew that this statement was false and materially misleading when he made it because Rogers, as the creator of the DAD Tax Shelters, knew that the various investments never turned a profit.

BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

139.   Additionally, Rogers knew that Plaintiffs would not, and could not, expect any return on his investment, because no collection activity occurred on the underlying debt, thus eliminating the opportunity for any returns or profit.

### Concealment of Material Facts

140.   On or about February 27, 2008, the IRS issued a Service Notice 2008-34 that declared DAT Tax Shelter transactions a "tax avoidance transaction."  Seyfarth, Rogers, and subsequently, Rogers & Associates knew these publications had been issued and failed to inform Plaintiffs.

141.   On or about March 23, 2010, the IRS issued a Coordinated Issue Paper that explicitly and expressly disqualified DAT Tax Shelter income tax deductions.  Seyfarth, Rogers, and Rogers & Associates knew these publications had been issued and failed to inform Plaintiffs.

142.   The issuance of Service Notice 2008-34 and the March 23, 2010 Coordinated Issue Paper are material facts that affected Plaintiffs' investments in the DAD Tax Shelters.

143.   As Plaintiffs' fiduciaries, Seyfarth, Rogers, and Rogers & Associates, had a duty to disclose these material facts to Plaintiffs.

144.   Instead, Seyfarth, Rogers, and, upon its creation, Rogers & Associates, remained silent, and Rogers, to reassure Plaintiffs, issued Newsletters, especially the 2008 Newsletter, that their investment was both legitimate and profitable, and that Plaintiffs would not suffer any penalties or injury.

145.   Furthermore, on or about May, 2008, Seyfarth forced Rogers to resign from his position as a partner.

## ⊒ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

146.    Seyfarth and Rogers concealed Rogers' forced resignation from Plaintiffs with the intent to prevent Plaintiffs from suspecting that their DAD Tax Shelters were in trouble, and subsequently investigating into the status of their DAD Tax Shelters.

**Reliance by Plaintiffs on the False Representation and Omissions of Material Fact**

147.    Between October 2003, and September, 2013, Seyfarth, Rogers, and Rogers & Associates made false representations and omissions of material fact detailed above with the intent to induce Plaintiffs to refrain from investigating into their investments.

148.    Plaintiffs relied on the misrepresentations and omissions of Seyfarth, Rogers, Rogers & Associates and Agresti by not investigating into the status of his investments and their legality. Instead, as expected by Seyfarth, Rogers, and Rogers & Associates, Plaintiffs trusted the representations of their fiduciaries—and agents acting on their behalf—that their investments would soon turn a profit and that they were legal. As a result, Plaintiffs did not investigate into the legality or effectiveness of the investments.

149.    Plaintiffs' reliance on the misrepresentations and omissions of Seyfarth, Rogers, Rogers & Associates and Agresti was reasonable because they were fiduciaries and held themselves out as experts in the field of tax and securities law, while Plaintiffs were inexperienced in both.

150.    From on or about October, 2003, through September, 2013, Plaintiffs met with, and spoke to, a number of attorneys and advisors to discuss unrelated legal matters. However, as a result of the fraudulent concealment by Seyfarth, Rogers, Rogers & Associates and Agresti, until September, 2013, the legality and efficacy of the DAD Tax Shelters was never discussed, or questioned, by Plaintiffs and their attorneys and advisors.

≡ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

151.    As a result of the fraudulent concealment on the part of Seyfarth, Rogers, Rogers & Associates and Agresti, Plaintiffs did not discover their injuries until on or around August, 2013, when despite all assurances made by Seyfarth, Rogers, Rogers & Associates and Agresti, the Circuit Court of Appeals for the Seventh Circuit confirmed that the DAD/DAT Tax Shelters were abusive.

### Tax Penalties

152.    Seyfarth, Rogers, and Rogers & Associates knew or should have known that the DAD Tax Shelters would expose Plaintiffs to penalties imposed by the IRS.

153.    Plaintiffs relied on the expertise of Seyfarth, Rogers, Rogers & Associates and Agresti to their detriment in continuing to report the losses from the DAD Tax Shelter on his tax return from 2003 through 2010 tax years.

154.    Seyfarth, through the false statements of its tax partner, Rogers, willfully, wantonly, materially, falsely, and fraudulently represented to Plaintiffs that they would not have exposure to or incur interest and penalties as a result of the DAD Tax Shelter deductions being disallowed by the Internal Revenue Service.

155.    Rogers, through the false statements of his agent, Agresti, willfully, wantonly, materially, falsely, and fraudulently represented to Plaintiffs that he would not have exposure to or incur interest and penalties as a result of the DAD Tax Shelter deductions.

156.    Rogers, by and through Rogers & Associates, willfully, wantonly, materially, falsely, and fraudulently represented to Plaintiffs that they would not have exposure to or incur interest and penalties as a result of the DAD Tax Shelter deductions.

157.    The IRS has imposed and Plaintiffs have incurred tax penalties and interest with respect to their investment in the DAD Tax Shelters for the tax years 2003 through 2010.

BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

158.    Plaintiffs have suffered, and will continue to suffer, tax penalties as a result of investment in the DAD Tax Shelters created and sold to Plaintiffs by Rogers and Agresti, and implemented by Seyfarth and Rogers.

159.    Plaintiffs have incurred, and will continue to incur, costs and expenses, including but not limited to, CPA and attorneys' fees, in defending IRS actions brought as a result of his investment in the DAD Tax Shelters created, promoted and sold by Defendants.

### COUNT I
### PROFESSIONAL MALPRACTICE
### (Against Seyfarth)

160.    Plaintiffs hereby repeat and reallege all of the preceding allegations contained within Paragraph 1 to Paragraph 160 as if set forth herein.

161.    Seyfarth owed Plaintiffs a duty to comply with the applicable standard of care for providing professional legal services because Seyfarth knew that its legal services to Warwick and Sugarloaf were ultimately intended to benefit Plaintiffs.

162.    Seyfarth failed to meet the applicable standard of care for providing professional legal services to Plaintiffs by giving negligent legal and tax advice to Plaintiffs, and for their benefit, as set forth above.  Seyfarth's failure to meet the standard of care proximately caused damages to Plaintiffs as set forth in this Complaint.

163.    Seyfarth's failure to meet the applicable standard of care constitutes negligence.

164.    In addition, Seyfarth's actions were outrageous and committed with such gross negligence as to indicate a wanton disregard and/or reckless indifference for the rights of Plaintiffs.

165.    Seyfarth's negligence/gross negligence was a proximate cause of Plaintiffs' damages.  In reasonable reliance on Seyfarth's advice regarding the DAD Tax Shelters, Plaintiffs

≣ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

participated in the DAD Tax Shelters and paid significant fees for professional advice and services in connection with the DAD Tax Shelters, filed federal tax returns that reflected losses generated from the DAD Tax Shelters, did not take advantage of other legitimate tax savings opportunities, and did not file qualified amended returns.

166.   But for Seyfarth's negligence/gross negligence, Plaintiffs would not have paid fees for advice on the DAD Tax Shelters, would not have engaged in the DAD Tax Shelters, would not have filed federal tax returns that utilized losses generated from the DAD Tax Shelters, would not have failed to avail themselves of other legitimate tax savings opportunities, and would not have failed to file qualified amended returns.

167.   Seyfarth's negligence/gross negligence proximately caused damages to Plaintiffs in that they (1) unnecessarily made investments to effectuate the DAD Tax Shelters, (2) are facing assessment of back-taxes and substantial penalties and interest by the IRS, (3) lost the opportunity to avail themselves of other legitimate tax-savings opportunities, (4) failed to file qualified amended returns, and (5) have and will continue to incur substantial additional costs to rectify the situation.

168.   As a result of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial and should be awarded actual damages in accordance with the evidence, plus attorneys' fees, interest and costs.

**Prayer for Relief**

WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor and against Seyfarth for:

A.   Damages in excess of $50,000.00;

B.   Consequential and incidental damages;

-35-

**≡ BERGER SINGERMAN**

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

C.    Disgorgement damages;

D.    Pre-and post-judgment interest;

E.    Attorneys' fees, expenses, and costs; and

F.    Such other relief that this Court deems just and equitable.

## COUNT II
### PROFESSIONAL MALPRACTICE
**(Against Rogers)**

169.    Plaintiffs hereby repeat and reallege all of the preceding allegations contained within Paragraph 1 to Paragraph 160 as if set forth herein.

170.    Because Rogers, a Seyfarth partner, was aware that the intent of his clients, the Rogers Entities, was for Seyfarth's legal services to ultimately benefit Plaintiffs, Rogers owed Plaintiffs a duty to comply with the applicable standard of care for providing professional legal services.

171.    Rogers failed to meet the applicable standard of care for providing professional legal services to Plaintiffs by giving negligent legal and tax advice to Plaintiffs, and for their benefit, as set forth herein. Rogers' failure to meet the standard of care proximately caused damages to Plaintiffs as set forth elsewhere in this Complaint.

172.    Rogers' failure to meet the applicable standard of care constitutes negligence.

173.    In addition, Rogers' actions were outrageous and committed with such gross negligence as to indicate a wanton disregard and/or reckless indifference for the rights of Plaintiffs.

174.    Rogers' negligence/gross negligence was a proximate cause of Plaintiffs' damages. In reasonable reliance on Rogers' advice regarding the DAD Tax Shelters, Plaintiffs participated in the DAD Tax Shelters and paid significant fees for professional advice and

⹂ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900 f: 954-523-2872

services in connection with the DAD Tax Shelters, filed federal tax returns that reflected losses generated from the DAD Tax Shelters, did not take advantage of other legitimate tax savings opportunities, and did not file qualified amended returns.

175.    But for Rogers' negligence/gross negligence, Plaintiffs would not have paid fees for advice on the DAD Tax Shelters, would not have engaged in the DAD Tax Shelters, would not have filed federal tax returns that utilized losses generated from the DAD Tax Shelters, would not have failed to avail themselves of other legitimate tax savings opportunities, and would not have failed to file qualified amended returns.

176.    Rogers' negligence/gross negligence proximately caused damages to Plaintiffs in that they (1) unnecessarily made investments to effectuate the DAD Tax Shelters, (2) are facing assessment of back-taxes and substantial penalties and interest by the IRS, (3) lost the opportunity to avail themselves of other legitimate tax-savings opportunities, (4) failed to file qualified amended returns, and (5) have and will continue to incur substantial additional costs to rectify the situation.

177.    As a proximate result of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial and should be awarded actual damages in accordance with the evidence, plus attorneys' fees, interest and costs.

### Prayer for Relief

WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor and against Rogers:

A.    Damages in excess of $50,000.00;

B.    Consequential and incidental damages;

C.    Disgorgement damages;

### BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

D.     Pre-and post-judgment interest;

E.     Attorneys' fees, expenses, and costs; and

F.     Such other relief that this Court deems just and equitable.

**COUNT III**
**PROFESSIONAL MALPRACTICE**
**(Against Rogers and Rogers & Associates)**

178.   Plaintiffs hereby repeat and reallege all of the preceding allegations contained within Paragraph 1 to Paragraph 160 as if set forth herein.

179.   Rogers was the sole proprietor and principal of Rogers and Associates. As such, both Rogers and Rogers & Associates were aware that the intent of its clients, the Rogers Entities, was for Rogers and Rogers & Associates' legal services to ultimately benefit Plaintiffs.

180.   As a result of the awareness and knowledge of the primary purpose of its representation of the Rogers Entities, Rogers & Associates owed Plaintiffs a duty to comply with the applicable standard of care for providing professional legal services.

181.   Rogers & Associates failed to meet the applicable standard of care for providing professional legal services to Plaintiffs by giving negligent legal and tax advice to Plaintiffs. Rogers & Associates' breach of the standard of care proximately caused damages to Plaintiffs as set forth elsewhere in this Complaint.

182.   Rogers & Associates failure to meet the applicable standard of care constitutes negligence.

183.   In addition, Rogers & Associates' actions were outrageous and committed with such gross negligence as to indicate a wanton disregard and/or reckless indifference for Plaintiffs.

**≡ BERGER SINGERMAN**

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

184.    Rogers & Associates' negligence/gross negligence was a proximate cause of Plaintiffs' damages.  In reasonable reliance on Rogers & Associates' advice regarding the DAD Tax Shelters, Plaintiffs participated in the DAD Tax Shelters and paid significant fees for professional advice and services in connection with the DAD Tax Shelters, filed federal tax returns that reflected losses generated from the DAD Tax Shelters, did not take advantage of other legitimate tax savings opportunities, and did not file qualified amended returns.

185.    But for Rogers & Associates' negligence/gross negligence, Plaintiffs would not have paid fees for advice on the DAD Tax Shelters, would not have engaged in the DAD Tax Shelters, would not have filed federal tax returns that utilized losses generated from the DAD Tax Shelters, would not have failed to avail themselves of other legitimate tax savings opportunities, and would not have failed to file qualified amended returns.

186.    Rogers & Associates' negligence/gross negligence proximately caused damages to Plaintiffs in that they (1) unnecessarily made investments to effectuate the DAD Tax Shelters, (2) are facing assessment of back-taxes and substantial penalties and interest by the IRS, (3) lost the opportunity to avail themselves of other legitimate tax-savings opportunities, (4) failed to file qualified amended returns, and (5) have and will continue to incur substantial additional costs to rectify the situation.

187.    As a proximate result of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial and should be awarded actual damages in accordance with the evidence, plus attorneys' fees, interest and costs.

### Prayer for Relief

WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor and against Rogers & Associates:

-39-

A.  Damages in excess of $50,000.00;

B.  Consequential and incidental damages;

C.  Disgorgement damages;

D.  Pre-and post-judgment interest;

E.  Attorneys' fees, expenses, and costs; and

F.  Such other relief that this Court deems just and equitable.

## COUNT IV
### FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### (Against Rogers)

188.   Plaintiffs hereby repeat and reallege all of the preceding allegations contained within Paragraph 1 to Paragraph 160 as if set forth herein.

189.   On or about the summer of 2003, Rogers authorized and appointed Agresti to act as his agent in marketing, promoting, selling, and implementing Rogers' DAD Tax Shelter, as part of Rogers' Brazilian debt collection business.

190.   Agresti, acting as Rogers' agent and in furtherance of the Brazilian debt collection business, thereafter placed advertisements in nationally circulated magazines promoting an investment opportunity in Brazilian distressed debt.

191.   On or about October, 2003, Korestsky, after seeing several of these magazine advertisements, called Agresti in order to learn more about the investment opportunity.

192.   Plaintiffs, at Rogers direction through Agresti, purchased the 2003 DAD Tax Shelter. Shortly thereafter, Rogers instructed Agresti to again contact Plaintiffs and encourage them to invest in the 2004 DAD Tax Shelter.

193.   Throughout 2004, Agresti, acting as Rogers' agent and in furtherance of the Brazilian debt collection business, followed up with Plaintiffs, speaking to them several times

ᴱ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

throughout the year by phone and email, in order to encourage the Plaintiffs to invest anew in the 2004 iteration of the DAD Tax Shelter.

194.    To that end, Agresti, at the direction of Rogers, told the Koretskys during these communications that he should reinvest for a variety of reasons, including that the Brazilian Real was coming out of recession, the initial year of any new business opportunity often under reform subsequent years and the quality of accounts receivable acquired by Warwick (then renamed Sugarloaf) had improved.

195.   Rogers is liable for the following affirmative false statements of material fact made by his agent, Agresti, to Plaintiffs during a series of telephone calls, in October, 2003 and again in the relevant period:

      a.    That past performance and current IRS treatment of DAD Tax Shelter investments purchased in the form of LLC Securities had established a legitimate and lawful method for an investor to claim an immediate tax loss;

      b.    That past performance and current IRS treatment of DAD Tax Shelter investments purchased in the form of LLC Securities allowed an investment by Plaintiffs in a DAD Tax Shelter to claim an immediate tax loss that Plaintiffs could legitimately and lawfully use to offset ordinary income and reduce income tax;

      c.    That the basis in the debt acquired by a DAD Tax Shelter and purchased in the form of LLC Securities was sufficient under Treasury Regulation 723 to justify the amount of the debt's carryover/transferred basis;

      d.    That the debt acquired by a DAD Tax Shelter and purchased in the form of LLC Securities would become partially worthless within the taxable year in which the

BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

debt was acquired and allow, under I.R.C. 166(A)(1), Plaintiffs to claim an income tax deduction equal to the amount of the partial worthlessness;

     e.     That the DAD Tax Shelter investments in the form of LLC Securities had economic substance and did not violate the "sham partnership doctrine" which disregards purported partnerships where the partners do not have a common intention to pursue an economic enterprise having economic substance and legitimate business purposes;

     f.     That the primary purpose of the DAD Tax Shelter investments in the form of LLC Securities was not to generate tax losses;

     g.     That Plaintiffs' investment in a DAD Tax Shelter in the form of LLC Securities would also allow him to deduct legal and promoter fees;

     h.     That DAD Tax Shelter investments in the form of LLC Securities had been independently vetted by the Chicago law firm of Seyfarth Shaw, LLP and declared legitimate and lawful.

196.     Rogers is liable for the failure of his agent, Agresti, between October, 2003, and September, 2013, to disclose to Plaintiffs the following material facts that he had a duty to disclose:

     a.     That Seyfarth's equity partner, Rogers, was not only the primary partner at Seyfarth that vetted the legitimacy and lawfulness of the DAD Tax Shelter, he also created and solely owned the DAD Tax Shelter entities used to acquire and contribute distressed Brazilian debt to the DAD Tax Shelters;

     b.     That not only would Seyfarth provide legal services to Plaintiffs in the form of drafting and preparing DAD Deal Documents, Seyfarth would also

≦ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

simultaneously provide legal services and represent DAD Tax Shelter entities owned and controlled by its equity partner, Rogers,;

      c.     That records required by the Internal Revenue Service to substantiate the validity of DAD Tax Shelter debt did not and had never existed;

      d.     That the full amount of an investment in a DAD Tax Shelter was not deductible because the investment was not "at risk" as required by I.R.C. §465.

197.   Between 2003 and at least 2010, Rogers made false statements of material fact in Form 1041s U.S. Income Tax Return for Estates and Trusts prepared and provided to Plaintiffs for Plaintiffs' investment and purchase of 2003 DAD Tax Shelter LLC Securities.

198.   Rogers failed to disclose to Plaintiffs that in 2004 that he (Rogers) received notices from the Internal Revenue Service that the use of distressed debt in tax shelter transactions was under investigation.

199.   Rogers failed to disclose to Plaintiffs the material fact that within a 4-5 month period in 2004, Rogers had put Plaintiffs' DAD Investment Security investments at peril by selling, without any redemption, two-hundred fifteen percent (215%) of Sugarloaf equity interest to two (2) Brazilian corporations (Globex and Lojas Arapua) in exchange for distressed consumer debt. Plaintiffs did not discover this until late 2013.

200.   Rogers failed to disclose to Plaintiffs the material facts that Rogers owned and controlled the corporate and trust entities that acquired distressed Brazilian consumer debt used to capitalize the trust entities sold as LLC Securities.

201.   Rogers failed to disclose to Plaintiffs the material fact that the corporate and trust entities that acquired distressed Brazilian consumer debt used to capitalize the trust entities sold to Plaintiffs as LLC Securities were Seyfarth clients.

BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

202.   The representations and omissions of material facts made by Rogers and Agresti and detailed hereinabove were made during the sale of LLC Securities as part of Rogers' Brazilian debt collection business.

203.   Plaintiffs were consumers under the Florida Deceptive and Unfair Trade Practices Act.

204.   The LLC Securities were things of value sold in trade or commerce under the Florida Deceptive and Unfair Trade Practices Act.

205.   Rogers, as a result of his experience as an attorney specializing in tax and securities law, knew, or at least reasonably believed, that the statements he made to Plaintiffs were false at the time he made them, which were made with the intent to induce Plaintiffs to invest in the DAD Tax Shelters in 2003 and 2004.

206.   Rogers, as a result of his experience as an attorney specializing in tax and securities law, and as the creator of the DAD Tax Shelters, knew, or at least reasonably believed, that the statements Agresti made to Plaintiffs were false at the time Agresti made them, which were made with the intent to induce Plaintiffs to invest in the DAD Tax Shelters in 2003.

207.   Plaintiffs relied on Rogers', and his agent Agresti's, false statements of material fact and invested in the DAD Tax Shelters in 2003 and 2004.

208.   Plaintiffs' reliance on Rogers' and Agresti's false statements of material fact was reasonable because Plaintiffs was inexperienced in tax and securities law, and Rogers along with his agent, Agresti, held themselves out as experts in tax and securities law.

209.   Further, Rogers and Agresti owed Plaintiffs a fiduciary duty of honesty as the sellers of securities, because Plaintiffs was a member of the class to which Rogers and Agresti were selling securities.

⨴ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

210.     Consequently, Plaintiffs have suffered, and will continue to suffer, tax penalties caused by his reliance on the material, false and misleading representations regarding DAD Tax Shelters made by the Seyfarth and Rogers Business Partnership, through its agent, Agresti, and, by Rogers, individually.

**Prayer for Relief**

WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor and against Rogers for:

A.     Actual damages;

B.     Punitive damages;

C.     Consequential and incidental damages;

D.     Attorneys' fees, expenses, and costs; and

E.     Such other relief that this Court deems just and equitable

**COUNT V**
**BREACH OF CONTRACT - MIPA**
**(against Warwick)**

211.     Plaintiffs hereby repeat and reallege all of the preceding allegations contained within Paragraph 1 to Paragraph 160 as if set forth herein.

212.     On November 11, 2003, Koretsky, through International Video, entered into the Membership Interest Purchase Agreement (the "MIPA") with Warwick, which is attached hereto as **Exhibit E**.

213.     Pursuant to the terms of the MIPA, Warwick offered to sell ninety-nine (99%) of its interest in Beaumont to Koretsky in exchange for US $150,000.00 (the "Purchase Price").

214.     Koretsky accepted this offer by executing the MIPA pursuant to its terms. *See* Exhibit E.

-45-

215.   The MIPA was a valid contract between Warwick and Koretsky.

216.   According to the MIPA, Koretsky was to pay the Purchase Price "by wire transfer . . . to an account designated by [Warwick]." Exhibit E.

217.   No such account was designated by Warwick in the MIPA.

218.   The identification of a wire transfer account is the type of term that would normally be included in a contract for the sale of securities.

219.   Rather than identify the relevant wire transfer account within the MIPA, John Gabel, as manager of Warwick through Jetstream, informed Koretsky to deliver the Purchase Price to Agresti, who would subsequently forward the Purchase Price to Warwick.

220.   On or about November, 2003, Koretsky paid the Purchase Price to Agresti by check.

221.   Koretsky, by paying the Purchase Price in the designated manner, performed his obligation under the MIPA.

222.   Warwick, as the seller, has breached a variety of the material terms of the MIPA, including:

223.   Section 1.1: Warwick failed to deliver to Koretsky the Beaumont membership interests;

224.   Section 2.4.3(a): Warwick sold Koretsky worthless assets (the Beaumont membership interests) in contravention of IRC 721, the Step Transaction Doctrine, and the Economic Substance Doctrine;

225.   Section 2.4.3(a): Warwick sold Koretsky worthless assets (the Beaumont membership interests) for the primary purpose of tax avoidance, as described in detail through this Complaint, in contravention of IRC 165(c)(2);

-46-

### ℥ BERGER SINGERMAN

226.    Section 2.4.3(c): Warwick sold Koretsky the Beaumont membership interests for the primary purpose of tax avoidance, as described in detail throughout this Complaint, in contravention of section 1.5 of the Operating Agreement of Beaumont, which states that the primary purpose of Beaumont is to "make investments," not serve as a tax avoidance mechanism; and

227.    Section 2.4.3(c): Warwick sold Koretsky the Beaumont membership interests for the primary purpose of effecting an illegal tax avoidance mechanism, as described in detail throughout this Complaint, in contravention of section 6 of the Articles of Incorporation of Beaumont, which states that the purpose of Beaumont is to effect the "transaction of any *lawful* business."

228.    As a result of the fraudulent concealment of Rogers, Seyfarth, and Agresti, in connection with the implementation and management of the tax shelters as described above, Plaintiffs did not, and reasonably could not, have known that Warwick breached the MIPA.

229.    Plaintiffs only discovered Warwick's breach of the MIPA on or about August, 2013.

230.    As a result of Warwick's material breaches of the MIPA, Koretsky has suffered injury in that Koretsky (1) paid $150,00.00 to effectuate the transaction described in the MIPA; (2) has been assessed with back-taxes and substantial penalties and interest by the IRS, (4) lost the opportunity to avail himself of other legitimate tax-savings opportunities, (5) failed to file qualified amended returns, and (6) has and will continue to incur substantial additional costs to rectify the situation.

⌐≡ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
*t:* 954-525-9900  *f:* 954-523-2872

231.     As a proximate cause of Warwick's material breaches of the MIPA, Koretsky has been injured in an actual amount to be proven at trial and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

### Prayer for Relief

WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor and against Warwick for:

A.     Damages of $150,000.00;

B.     Punitive damages;

C.     Consequential and incidental damages;

D.     Disgorgement damages;

E.     Pre-and post-judgment interest;

F.     Attorneys' fees, expenses, and costs; and

G.     Such other relief that this Court deems just and equitable.

### COUNT VI
### BREACH OF CONTRACT – MIPA
### (Against Sugarloaf)

232.     Plaintiffs hereby repeat and reallege all of the preceding allegations contained within Paragraph 1 to Paragraph 160 as if set forth herein.

233.     On October 15, 2004, Koretsky, through International Video, entered into the Membership Interest Purchase Agreement (the "MIPA") with Sugarloaf.

234.     Pursuant to the terms of the MIPA, Sugarloaf offered to sell ninety-nine (99%) of its interest in Longmeadow to Koretsky in exchange for US $200,000.00 (the "Purchase Price").

235.     Koretsky accepted this offer by executing the MIPA pursuant to its terms. *See* Composite Exhibit D.

-48-

236.   The MIPA was a valid contract between Sugarloaf and Koretsky.

237.   According to the MIPA, Koretsky was to pay the Purchase Price "by wire transfer . . . to an account designated by [Sugarloaf]." Composite Exhibit D.

238.   No such account was designated by Sugarloaf in the MIPA.

239.   The identification of a wire transfer account is the type of term that would normally be included in a contract for the sale of securities.

240.   Rather than identify the relevant wire transfer account within the MIPA, John Gabel, as manager of Sugarloaf through Jetstream, informed Koretsky to deliver the Purchase Price to Agresti, who would subsequently forward the Purchase Price to Sugarloaf.

241.   On or about December 2004, Koretsky paid the Purchase Price to Agresti by check.

242.   Koretsky, by paying the Purchase Price in the designated manner, performed his obligation under the MIPA.

243.   Sugarloaf, as the seller, has breached a variety of the material terms of the MIPA, including:

244.   Section 1.1: Sugarloaf failed to deliver to Koretsky the Longmeadow membership interests;

   a.   Section 2.4.3(a): Sugarloaf sold Koretsky worthless assets (the Longmeadow membership interests) in contravention of IRC 721, the Step Transaction Doctrine, and the Economic Substance Doctrine;

   b.   Section 2.4.3(a): Sugarloaf sold Koretsky worthless assets (the Longmeadow membership interests) for the primary purpose of tax avoidance, as described in detail through this Complaint, in contravention of IRC 165(c)(2);

⊴ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
t: 954-525-9900  f: 954-523-2872

c.      Section 2.4.3(c): Sugarloaf sold Koretsky the Longmeadow membership interests for the primary purpose of tax avoidance, as described in detail throughout this Complaint, in contravention of section 1.5 of the Operating Agreement of Longmeadow, which states that the primary purpose of Longmeadow is to "make investments," not serve as a tax avoidance mechanism; and

d.      Section 2.4.3(c): Sugarloaf sold Koretsky the Longmeadow membership interests for the primary purpose of effecting an illegal tax avoidance mechanism, as described in detail throughout this Complaint, in contravention of section 5 of the Articles of Organization of Longmeadow, which states that the purpose of Longmeadow is to effect the "transaction of any *lawful* business."

245.    As a result of Sugarloaf's material breaches of the MIPA, Koretsky has suffered injury in that Koretsky (1) paid $200,00.00 to effectuate the transaction described in the MIPA; (2) has been assessed with back-taxes and substantial penalties and interest by the IRS, (4) lost the opportunity to avail himself of other legitimate tax-savings opportunities, (5) failed to file qualified amended returns, and (6) has and will continue to incur substantial additional costs to rectify the situation. Moreover, these breaches were not known or ascertainable until the tax appeals were adjudicated or otherwise resolved.

246.    As a proximate cause of Sugarloaf's material breaches of the MIPA, Koretsky has been injured in an actual amount to be proven at trial and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

### Prayer for Relief

WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor and against Sugarloaf for:

-50-

A.    Damages of $200,000.00;

B.    Punitive damages;

C.    Consequential and incidental damages;

D.    Disgorgement damages;

E.    Pre-and post-judgment interest;

F.    Attorneys' fees, expenses, and costs; and

G.    Such other relief that this Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury for all issues so triable.

Dated: August 12, 2015

> BERGER SINGERMAN LLP
> *Counsel for Plaintiffs*
> 350 East Las Olas Boulevard,
> Suite 1000
> Fort Lauderdale, FL 33301
> Telephone: (954) 525-9900
> Fax: (954) 523-2872
>
> By:   /s/ Charles H. Lichtman
> CHARLES H. LICHTMAN
> Fla. Bar No. 501050
> clichtman@bergersingerman.com;
> DRT@bergersingerman.com
> ROBBIE T. BOONE, JR.
> Fla. Bar No. 105752
> rboone@bergersingerman.com;
> DRT@bergersingerman.com

6092045-9

≝ BERGER SINGERMAN

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301
*t:* 954-525-9900  *f:* 954-523-2872